**AUSTIN v. CHICAGO, R. I. & G. RY. CO. et al. (No. 3246.)**

Court of Civil Appeals of Texas. Amarillo. June 5, 1929.

Rehearing Denied June 26, 1929.

R. E. Stalcup, of Dalhart, for appellant.
Tatum & Strong, of Dalhart, and F. B. Walker, of Fort Worth, for appellees.

RANDOLPH, J. This suit was filed by Austin against the Chicago, Rock Island & Gulf Railway Company, Chicago, Rock Island & Pacific Railway Company, and the Fort Worth & Denver City Railway Company, to recover damages to a shipment of hogs. The parties will be styled as in the trial court.

Upon a peremptory instruction by the trial court, the jury returned a verdict for the defendants, and judgment was rendered accordingly, and appeal has been taken to this court.

The plaintiff's petition alleged substantially: That the two Rock Island Railroad Companies had a continuous line from St. Joseph, Mo., to Dalhart, Tex., and that the Denver Railroad had its line of road running through Dalhart to and through Hartley, Tex. That on the 23d day of October, 1926, the plaintiff, for a consideration paid as freight, entered into a written contract with the defendants as connecting carriers, by and through the Chicago, Rock Island & Pacific Railway Company, as initial carrier, by the terms of which the defendants contracted and agreed to transport for the plaintiff, with reasonable diligence and care, a carload of hogs from the city of St. Joseph, Mo., to Hartley, Tex. That, pursuant to such contract, the plaintiff, on or about the 23d day of October, 1926, delivered to such initial carrier a carload of hogs to be shipped and delivered to the plaintiff at Hartley, Tex.

Plaintiff further alleges:

That, at the time of the injuries complained of, the defendant Fort Worth & Denver City Railway Company, had an office and agent in the town of Hartley, Tex., and maintained there certain facilities for the unloading and loading of live stock, and had then and there and for a long time prior thereto, received and unloaded live stock shipped over its lines of the class and kind that plaintiff was having it ship, and it was the duty of said Denver Railroad, under the law and under its contract with the plaintiff, to have at such point proper and sufficient facilities for the prompt and efficient unloading of the plaintiff's hogs upon their arrival at Hartley.

That about 1 o'clock on the 26th of October, 1926, being the date of the arrival of said hogs in Hartley, Tex., said car reached Dalhart, Tex., over the line of the defendant Chicago, Rock Island & Gulf Railway Company, within 26 hours after said hogs had last been unloaded, watered, and fed, as the law required under the federal statutes and federal regulations pertaining to shipments of live stock in interstate carriers. That while said hogs were so in Dalhart, Tex., the plaintiff then and there had full opportunity to have said hogs unloaded, wa-

tered, and fed so that they would reach Hartley and be there unloaded within 36 hours after same were last unloaded, watered, and fed, and would have done so except for the wrongful acts of the defendants as follows: That at about the hour of 3 o'clock p. m., on said date, the plaintiff called at the office of the defendant Fort Worth & Denver City Railway Company, at Hartley, Tex., and informed its agent that the hogs had just been received over the line of the Chicago, Rock Island & Gulf Railway Company, at Dalhart, Tex., billed to Hartley, Tex., and informed said agent of defendant Fort Worth & Denver City Railway Company, if said defendant could not receive said hogs from its connecting carrier and transport to and unload same at Hartley, Tex., during that afternoon and within and prior to the 36 hours from the time said hogs were last watered, fed, and rested, plaintiff would order the hogs to be unloaded, watered, rested, and fed at Dalhart, Tex. That, acting within the scope of his duties as agent of said defendant and within the terms of said contract of shipment and within his common-law duties as a common carrier, the said agent then and there told the plaintiff to have said car at once transferred to the line of the said defendant at Dalhart, Tex., and that said defendant, in accordance with said contract and under its duties as such common carrier, would transport to and deliver said hogs at once to Hartley, Tex., and that the same would be unloaded and delivered to the plaintiff during that day so that they could be watered and fed within said 36-hour limit provided by law. That the plaintiff then and there gave notice to said defendant that the hogs would have to be unloaded during that day in order to be fed and watered and rested during the 36-hour limit and gave notice to said defendant through said agent that, unless same was done, he would be greatly damaged by reason of holding the hogs in the car for too long a time without feed, water, and rest.

That, relying on said agreement and the promises of the defendants, the plaintiff had his car of hogs delivered to the defendant Fort Worth & Denver City Railway Company, about 4 o'clock on the afternoon of the said day and the same was transported by said defendant to Hartley, Tex., reaching there about 7 o'clock in the afternoon; but the defendants, wholly disregarding their duties as common carriers, negligently failed and refused to unload said hogs and make delivery of same to the plaintiff until about 9 o'clock on the following day, thereby keeping the hogs on the cars for an unreasonable and unlawful length of time, to wit, 44 hours, and beyond the 36-hour limit fixed by regulation for the unloading, feeding, and rest of live stock in interstate transportation. That, when the hogs reached Hartley,

defendants had not made sufficient provision for unloading hogs of the class and kind shipped by the plaintiff, as was their duty to do under said contract and under the requirements of the law.

It is agreed by the parties hereto that no complaint of negligence on the part of the defendants is charged anywhere on the run from St. Joseph, Mo., until the hogs reached Hartley, Tex.

The contract for the shipment of the hogs between plaintiff and defendants contains the following provision, among others: First, providing for a declaration by the shipper that, for the purpose of applying the lawful rate of freight, the shipper must declare the shipment to be "ordinary live stock," specifying the kind or kinds of animals, or, if not "ordinary live stock," the shipper must declare the kind and value of each animal. It is also provided that, on shipments of ordinary live stock, no declaration of value shall be made by the shipper, nor shall any values be ordered on this bill of lading. Upon this contract or bill of lading was indorsed: "I (we) declare the shipment covered by this bill of lading to be ordinary live stock. J. H. Austin, shipper."

It is further provided in said bill of lading:

"Section 4 (a). The shipper at his own risk and expense shall load and unload the live stock in and out of the cars, except in those instances where this duty is made obligatory upon the carrier by statute or is assumed by a lawful tariff provision. * * *"

The defendants introduced in evidence the following item of tariff sheet used by the Interstate Commerce Commission from Tariff No. 1792, Southwestern Lines' Tariff No. 29–a, to wit:

"1086. From or to stations where there are no facilities for the handling of carloads of live stock, in either single or double deck cars, or both, rates will apply only where shippers or consignees furnish the necessary appliances for loading or unloading; such appliances to be provided by the shipper or consignees at their own expense and risk."

Waiving any discussion of the right of the defendants to require the plaintiff to furnish the facilities for loading and unloading the hogs at Hartley, Tex., and the question of the Interstate Commerce Commission having the power to require a shipper to furnish facilities for loading and unloading the live stock, to a common carrier whose business it is to furnish such facilities and of the construction to be placed on the Carmack and Cummins Amendment to the Hepburn Act, title 49, § 20, par. (11), of the United States Code Annotated, we shall proceed to a discussion of the question, which, in our opinion, is decisive of the appeal in this case.

■ The trial court having given a peremptory instruction to the jury to find for the

defendants, either because of the lack of evidence or because as a matter of law the plaintiff was not entitled to recover, in addition to the assignments presented in plaintiff's brief, is fundamental error if the evidence and the law required the submission of the case to the jury, and must be considered by us. Choate v. S. A. & A. P. Ry. Co., 90 Tex. 82, 88, 36 S. W. 247, 37 S. W. 319; Harpold v. Moss, 101 Tex. 542, 109 S. W. 928; Lockney Farmers' Co-op. Soc. v. Egan (Tex. Civ. App.) 275 S. W. 732, 733.

■ While the evidence is conflicting, such conflict is to be solved by the jury unless it is apparent that no other verdict could have been rendered except that ordered to be rendered by the trial court, under the law and the evidence in the case.

Considering the evidence offered by the plaintiff, we find that he had learned that the car of hogs had arrived at Dalhart. He then went to the agent of the defendant Fort Worth & Denver City Railway Company, at Hartley, and informed said agent of that fact for the purpose of finding out if he could unload them and get water hauled to the pens for them; this was about 3 o'clock in the afternoon of that day. He asked the agent if he could unload them at Hartley, and the agent answered "Yes." He then informed the agent that, if he could not unload them that night, it would be past the 36-hour limit, and discussed with the agent at Hartley the fact of unloading the hogs at Dalhart, if he could not unload them at Hartley that afternoon, and told such agent that he had made arrangements for this at Dalhart. The agent at Hartley then told him to get them down and he would unload them at Hartley; that he would have them unloaded as soon as received. The Fort Worth & Denver City Railway Company had stockpens at Hartley, but had no water or feed in the yards at that time, and he (Austin) had water hauled to the yard. He then went to Dalhart and had the car transferred to the Denver Railroad. It was after dark about 8 o'clock, when the hogs arrived at Hartley. When the train arrived at Hartley, the car of hogs was "cut out" of the train and placed on a siding about a quarter of a mile south of the stockpens, and plaintiff testifies as to his attempt to get the hogs unloaded, as follows:

"I talked to the conductor and asked him to spot them; and he said that he would not spot them without instructions from the agent. I then got into my car and went to the agent's house; the depot was closed at that time. Mr. Wadsworth informed me that according to the contract, they could not unload them in public pens; they had been unloading them for some time; that they could not be unloaded according to the instructions; he called his dispatcher and told me there was no chance of unloading them

until morning, when they got the section hands out. He informed me that he would get the section hands out at 8:00 o'clock the next morning, and unload the hogs. I told him it would run over the 36-hour limit if they waited to unload them until the next morning, and I called his attention to, in fact, I told him then that this delay would result in damage to the hogs. I said they would be damaged if they went too long without water and that we would lose some of them before I got them home, if they had to wait until morning without water."

The hogs were not unloaded until the next morning. Early next morning the plaintiff was in Hartley, but did not see the agent until about 8 o'clock, when he came down to the station. At that time no effort had been made to unload the hogs. After the agent came down, the section crew came and helped unload the hogs. It took about an hour to fix a chute, and the hogs were unloaded about 9 or 9:30 o'clock. The railroad company did not furnish any facilities for watering the hogs or feeding them at Hartley, nor give the plaintiff an opportunity to do so. That the hogs were on the car for 44 hours without water or feed. Then follows the plaintiff's testimony as to damages, etc.

It is clear from this evidence that an issue was presented which should have been submitted to the jury.

The question of the retention of the hogs on the cars for more than the legal limit of time without feed and water and rest, and whether the failure to do so was caused by the defendants or the plaintiff, was a question not to be decided by the court, but was to be decided and should have been decided by the jury.

*"Where Carrier Fails to Furnish Facilities for Care of Stock.* Although a special contract requires the shipper to give care and furnish food and water to stock in transit, the carrier is still bound to afford him or his agent reasonable facilities for doing so, and it will be liable for loss or injury resulting from its neglect to perform this duty for the reason that where the carrier fails to discharge this duty, any stipulation requiring the shipper to feed and water stock shipped, is unreasonable and void." 10 C. J. 97, § 111.

"In order to fasten liability on the carrier, it is not necessary that there should be a wanton refusal on its part to furnish the necessary facilities." 10 C. J. supra.

"While the carrier's duty does not require it to keep water on hand in its pens at all times and under all circumstances, such duty is not discharged by stopping at places where there are no such facilities or where neither feed nor water is obtainable." 10 C. J. 101, § 115.

"The common law imposes upon the carrier of live stock the duty to provide safe

and proper places for loading and unloading stock delivered to it for transportation, and it will be liable for loss or injury to animals sustained while being loaded or unloaded, because of the insufficiencies of facilities or want of safety of places furnished. This is true, even though the shipper by special contract has assumed the duty of loading and unloading the stock shipped." 10 C. J. 104, §§ 121, 122, 123.

"And, notwithstanding the existence of a contract which imposes on the shipper the duty of loading and unloading the carrier is none the less bound to furnish suitable and safe facilities for loading and unloading, it will be liable for loss or injuries sustained through a neglect of this duty unless the shipper knew of the unsafe condition of the appliances and nevertheless undertook to unload his stock, assuming the risk of the injury. The management and control of trains is in the carrier's own hands and the facilities for loading and unloading along the route are its property and it cannot, by contract, release itself from liability for a failure to exercise control of its property so as to allow the shipper to discharge the duties which he has assumed." 10 C. J. 106, § 125.

In the case of Illinois Cent. R. Co. v. Eblin, 114 Ky. 817, 71 S. W. 919, the Court of Appeals of Kentucky, in considering section 4387, U. S. Compiled Statutes 1901, which provides as follows: "Animals so unloaded shall be properly fed and watered during such rest by the owner or person having the custody thereof, or in case of his default in so doing, then by the railroad company. * * * At the expense of the owner or person in custody thereof * * *"—and also article 4386, same Statutes, providing that such shipment of live stock shall not be confined in cars for a longer period than 28 hours without unloading them for rest, feed, and water, holds that:

"A carrier will not be relieved from liability for a violation of the statute by the mere fact that a special contract existed, under which the shipper assumed the duty of feeding such stock, unless the railroad company in fact furnished the necessary facilities to enable the shipper to do so, as the negligence belongs to that class against which a common carrier is not permitted to contract. * * * The common-law rule on this subject is stated by Mr. Ray in his work on Imposed Duties, in these words: 'The carrier is liable for injuries to stock delivered it for transportation arising from a failure to furnish proper facilities for feeding and watering them, though the shipper has agreed to accompany his stock, and feed and water them at his own risk.'"

In the case of F. W. & D. C. Ry. Co. v. Daggett, 87 Tex. 322, 329, 28 S. W. 525, 527, Justice Denman, speaking for the Supreme Court of Texas, says:

"We are further of opinion, that the special contract, as well as said Act of Congress, relieved the carrier of the duty, in the first instance, of feeding and watering at such points as it furnished reasonable facilities to the shipper to do so, but that in the absence of such facilities at any point the contract would be unreasonable as to such point, and the carrier would be liable for any damage resulting from the failure to feed and water at such point."

The Court of Civil Appeals at San Antonio, in the case of C., R. I. & P. Ry. Co. v. Mitchell, 85 S. W. 286, considering a shipper's contract wherein it is provided that the shipper shall assume all risks of feeding, watering, etc., holds that it does not relieve the carrier from liability for its own negligence.

■ A common carrier cannot contract against its own negligence nor place unreasonable restrictions on its common-law liability, though the contract be for interstate shipments of goods. S. A. & A. P. Ry. Co. v. Dolan (Tex. Civ. App.) 85 S. W. 302.

■ If a contract requires a shipper of live stock to load, unload, feed, water, and attend to stock at his own expense and risk while in the yards awaiting shipment and while in the cars or at the feeding or transfer points, it is the duty of the carrier to furnish the shipper with the opportunity and facilities for properly watering stock during transportation. S. A. & A. P. Ry. Co. v. Chittim (Tex. Civ. App.) 135 S. W. 747.

Where a shipper of live stock notified the carrier of his desire to water the stock while in the pens awaiting transportation and the stock needed water, the jury could find that the failure of the carrier to provide reasonable facilities for watering the stock was actionable negligence. S. A. & A. P. Ry. Co. v. Chittim, supra.

It is the duty of a common carrier of live stock to furnish all necessary facilities for the proper rest, exercise, and refreshment of the animals received by it for transportation. The time and place where rest and refreshment may be necessary must be left to the judgment of the carrier and not the shipper. 2 L. R. A. Digest, 1402, § 639a.

■ The rule is laid down by the Supreme Court of the United States that a limitation of liability, to be valid, must be reasonable. Baltimore, etc., Ry. Co. v. Voigt, 176 U. S. 498, 507, 20 S. Ct. 385, 44 L. Ed. 560; Cau v. Texas, etc., Ry. Co., 194 U. S. 427, 431, 24 S. Ct. 663, 48 L. Ed. 1053; Southern Exp. Co. v. Caldwell, 21 Wall. 264, 266, 22 L. Ed. 556. A common carrier cannot, by declaring or stipulating that it shall not be so considered, divest itself of the liability attached to the fixed legal character of its occupation. 3 Ency. U. S. Supreme Court Reports, 602, note 24.

The plaintiff's testimony showed that, when the car of hogs arrived in the train

coming from Dalhart to Hartley, he requested the conductor of the train to "spot" the car for unloading, which the conductor refused to do. It is true that the plaintiff evidently expected the railroad company to unload the hogs, but that is immaterial to the issue of negligence or no negligence on the part of the defendant company. It was the duty of the company to so place the car that the plaintiff would be given a reasonable opportunity to unload it. The refusal, therefore, of the request to "spot" the car was tantamount to a refusal to deliver the hogs to the plaintiff. Instead the car was shunted onto a siding about a quarter of a mile from the stockpens and left there all night. While there was no "wanton" refusal, the conduct of the defendant's employees was effective in keeping the plaintiff from taking possession of the hogs.

At the time of the unloading of the hogs the next morning, the 36-hour limit without water, rest, or feed had been long exceeded. This conduct on the part of the defendant's employees left the hogs in the possession of the company without any tender of delivery to the plaintiff, and this, too, when it clearly appears that the company's duty, when it had retained the hogs, was to feed and water them or to have given the plaintiff a reasonable opportunity to do so. The plaintiff claims that this delay in resting, watering, and feeding the hogs caused the injuries complained of.

We therefore reverse the judgment of the trial court, and remand the case to that court for a trial on the merits and upon the issues as to whether or not the defendants were guilty of negligence.